# STATE OF MICHIGAN

# COURT OF APPEALS

In re HARBERT, Minors.

UNPUBLISHED
December 27, 2016

No. 332712; 333092
Jackson Circuit Court
Family Division
LC No. 15-003166-NA

Before: M. J. KELLY, P.J., and O'CONNELL and BECKERING, JJ.

PER CURIAM.

In these consolidated appeals,[1] respondent-father in Docket No. 332712 and respondent-mother in Docket No. 333092 each appeal by right the trial court's order terminating their parental rights to their sons, CH and JH, under MCL 712A.19b(3)(b), (g), (j), and (k). At the time of the trial, CH was 12 years old and JH was 10 years old. On appeal, both parents argue that the trial court erred in terminating their parental rights on a variety of grounds. For the reasons more fully explained below, we conclude that there were no errors warranting relief. Accordingly, we affirm in both dockets.

## I. BASIC FACTS

In September 2015, respondent-mother dropped CH off at the home of her parents. CH asked them to assist him with removing his pajamas because the pajamas were stuck to his skin. After helping him, the grandparents observed that his buttocks were "red, raw, and tender." CH's grandmother called her daughter that same day; she described the injury to her and asked her to verify JH's well-being and call the police department. After mother did nothing over a period of weeks, the grandparents reported the abuse on November 16, 2015.

The Department of Health and Human Services (DHHS) removed JH from his parents' care and had both children examined at a hospital. The treating doctor reported that CH's buttocks had old bruising, scar tissue, and appeared "balloon like." He similarly reported that JH's buttocks had a significant injury and "appeared to be black, raw, and swollen, with

---

[1] See *In re Harbert Minors*, unpublished order of the Court of Appeals, entered June 29, 2016 (Docket Nos. 3327123; 333092).

-1-

extensive tissue damage"; his injuries were so severe that he had to be hospitalized. The DHHS immediately petitioned the trial court to terminate both parents' parental rights.

The trial court held a trial over three days. At trial, CH testified that his parents were dog handlers. The family had about 20 dogs that were housed in the basement. CH said that he and his brother were primarily responsible for the care of the dogs. They had to take them outside to the kennels, clean their crates with a bucket of soap and water, fill their water bowls, and "basically make sure they're fed and healthy and stuff like that." The dogs were the family's main source of income. CH said father supervised them during the day because mother worked at night and would sleep most of the day. Mother would take the dogs to shows every weekend.

Both children testified about father's use of extreme corporal punishment. CH testified that father punished him nearly every day since he was 5 years old. Father often punished him for "stuff" that he did to the dogs—such as forgetting to give them water or clean their crates. But other times he punished them for "tiny stuff" or just because he was angry. JH said father would punish him "pretty much every day"; he would beat him for not doing "stuff correctly."

CH said father started punishing him by hitting him with a "piece of pipe, and then, it escalated to a leash, and then, it escalated to the two-by-four." Father would force him to bend over a chair in the kitchen to receive his punishment. CH said father used a special two-by-four and would sometimes act like the two-by-four was a giant baseball bat and he was the ball. He said that he would be in a lot of pain on the lower half of his body after a beating. Sometimes it would be hard to move afterward: "the blood and stuff would stick" to "my underwear and my pants" and "it would be really hard to move." It was difficult to go to the bathroom too "[b]ecause all the blood and stuff would get—would start to dry and get stuck to each other, and it would get stuck to my butt, and it would just rip off skin and stuff whenever—whenever I tried to go to the bathroom."

JH testified that father had been hitting him with a two-by-four "most of my life pretty much." His buttocks would "become swollen"; there would be "skin gone, like flesh was literally gone from it too, and it was . . . all red around, and—bleeding." JH too described how his injuries would stick to his clothing: "My underwear was always getting stained. It would— the underwear would either stick to it and become stained also, but—and the result of it sticking to it, it would come off very painfully."

An officer testified that he spoke to respondents individually one or two days after JH was removed from their care. Father admitted that he hit both boys with a piece of wood and hit CH with a dog leash. He stated that he spanked them daily. Mother told the officer that they used "a board to spank the kids," and she admitted that she spanked JH with the board five times earlier on the day of his removal. When he asked if she would ever hit her dogs with a piece of wood, she replied, " '[a]bsolutely not' "; she explained: the dogs " 'never lied to us.' "

The emergency room physician who treated the boys after JH's removal testified that JH had "large wounds on the back of both sides of the buttocks. Both buttocks were very swollen." The tissue that was open was "weeping" because it had not been treated in any capacity; "it was just an open, fresh wound that was, you know, continuously irritated and weeping." The wounds were "well through the skin and deep into the fatty tissue of the buttocks." The physician said

-2-

CH showed that he had a significant amount of swelling to his buttocks—his buttocks were twice the normal size and had become "bulbous" and protruded backwards. He also had bruising and discoloration of his skin. He stated that, from the nature of the injury, one could say "with certainty that he [CH] suffered repeated injury to his buttocks."

After the close of proofs, the trial court found that jurisdiction was appropriate and that the DHHS had proved by clear and convincing evidence grounds to terminate both parents' parental rights under MCL 712A.19b(3)(b), (g), (j), and (k). It also found that termination was in the children's best interests. The trial court signed orders taking jurisdiction and terminating respondents' parental rights in April 2016. Mother moved for reconsideration later that same month, but the trial court denied the motion.

Both respondents then appealed in this Court.

## II. RESPONDENT-FATHER'S ISSUES ON APPEAL

### A. CONSTITUTIONAL RIGHT TO PARENT

Father first argues that he has a constitutional right to parent his children and suggests that the trial court must have presumed that he was an unfit parent in violation of this right. Because he did not raise this claim of error before the trial court, we shall review it for plain error affecting his substantial rights. See *In re Utrera*, 281 Mich App 1, 8-9; 761 NW2d 253 (2008).

Father cites numerous authorities discussing the constitutional right to parent, but he does not specifically state how the trial court violated his constitutional right to parent his children. He does not even discuss his assertion that the trial court must have entertained an impermissible presumption or it would not have proceeded to terminate his parental rights. "It is not enough," our Supreme Court aptly noted more than 50 years ago, "for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position." *Mitcham v Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959). It is the appellant's responsibility to brief his questions on appeal and the failure to adequately do so "is tantamount to abandoning it." *Id.* By failing to properly argue and support his claim that the trial court violated his constitutional rights to parent his children, father abandoned this issue on appeal.

In any event, the state may constitutionally terminate a parent's parental rights if it affords the parent fundamentally fair procedures, which includes establishing by clear and convincing evidence that termination is warranted. See *Santosky v Kramer*, 455 US 745, 753-754, 769-770; 102 S Ct 1388; 71 L Ed 2d 599 (1982); see also *In re Clausen*, 442 Mich 648, 687, 687 n 46; 502 NW2d 649 (1993). Here, there is no evidence that the trial court failed to adhere to the requirements of due process or otherwise engaged in unfair procedures. Consequently, there was no plain error.

## B. GROUNDS FOR TERMINATION

Father next argues that the trial court clearly erred when it found that the DHHS established grounds to terminate his parental rights under MCL 712A.19b(3)(b)(*i*), (g), (j), and (k). As part of his argument, he maintains that the trial court could not find that he battered, tortured, or otherwise inflicted severe physical abuse on the children because there was no evidence as to what constituted battering, torture, or other severe physical abuse.

This Court reviews de novo whether the trial court properly selected, interpreted, and applied the relevant statutes. *IME v DBS*, 306 Mich App 426, 433; 857 NW2d 667 (2014). This Court reviews for clear error a trial court's factual findings in a termination proceeding. *In re Gonzales/Martinez*, 310 Mich App 426, 430; 871 NW2d 868 (2015). A trial court's finding is clearly erroneous when, after reviewing the entire evidence, this Court is left with the definite and firm conviction that the trial court has made a mistake. *Id.* at 430-431. However, because father did not argue before the trial court that the DHHS had to present evidence as to what constitutes battering, torture, or other severe physical abuse, we shall review that claim for plain error. *In re Utrera*, 281 Mich App at 8-9.

Before the trial court could terminate father's parental rights to the children, it first had to find that the DHHS proved at least one statutory ground for termination by clear and convincing evidence. *In re Gonzales/Martinez*, 310 Mich App at 431. The DHHS petitioned for the termination of father's parental rights under four statutory grounds: MCL 712A.19b(3)(b), (g), (j), and (k). The grounds stated under MCL 712A.19b(3)(b)(*i*) and (k)(*iii*) both address situations where there is evidence that the parent physically abused the child at issue.

A trial court may terminate a parent's parental rights under MCL 712A.19b(3)(b)(*i*) if it finds that the "child or a sibling of the child has suffered physical injury or physical or sexual abuse" and—in relevant part—the parent's "act caused the physical injury or physical or sexual abuse and the court finds that there is a reasonable likelihood that the child will suffer from injury or abuse in the foreseeable future if placed in the parent's home." Likewise, if the court finds that the parent "abused the child or a sibling of the child and the abuse" amounted to "[b]attering, torture, or other severe physical abuse," it may terminate the parent's parental rights under MCL 712A.19b(3)(k)(*iii*). One important distinction between these two grounds is that, in the case of MCL 712A.19b(3)(b)(*i*), the court must find that it is reasonably likely that the child will suffer from injury or abuse in the foreseeable future if placed in the parent's home whereas no such finding is required to terminate under MCL 712A.19b(3)(k)(*iii*); instead, the severity of the abuse alone warrants termination.

The overwhelming evidence at trial established that father repeatedly and viciously beat both boys over a period of years. Both boys testified that father beat them nearly every day and that he would do so for even slight infractions. They stated that he most often beat them with a two-by-four. CH described a typical beating and stated that father would swing the two-by-four as though it were a baseball bat. The boys also each testified that father had in the past choked them to the point of unconsciousness. Although they admitted that father would on occasion use discipline that did not involve physical abuse, their testimony permitted an inference that extreme corporal punishment was the norm rather than the exception. See *People v Hardiman*,

466 Mich 417, 428; 646 NW2d 158 (2002) (stating that circumstantial evidence may give rise to multiple inferences and those inferences may even give rise to further inferences).

CH and JH also described in detail the effects of the beatings; their skin would peel off their bodies, their buttocks would have blisters, and the wounds would drip blood. They both stated that the injuries would produce tremendous pain and take a long time to heal. While healing, the wounds would stick to their underclothes and skin would peel away when they removed their clothing. CH stated that his injuries were often so severe that he would find it difficult to perform his chores, which would then lead to further beatings.

There was also medical testimony that established that both boys had been severely physically abused. The doctor who first treated CH and JH after the abuse came to light testified about the extent of the injuries and opined that the injuries were consistent with having been beaten with a two-by-four: "I think the shape of the wound and the fact that it was roughly the same width as a two-by-four . . . and it was across the entire length of his . . . buttocks" would be consistent with someone "winding up with a two-by-four and hitting him across the backside." He stated that JH's injury necessitated hospitalization. Even though CH's injury did not require hospitalization, the physician testified that his buttocks were swollen to twice the normal size. Given the evidence that father did not have access to CH over the past six or more weeks before the examination, this testimony permitted an inference that CH's injury was severe when first inflicted. Another physician later examined the boys and determined that CH's misshapen buttocks were likely the result of repeated abuse over a long period of time. There was also testimony that both boys had mental and emotional difficulties that were consistent with having been physically abused over a period of years.

Although father argues that there was no evidence to establish what constitutes battering, torture, or other severe physical abuse, the terms are readily susceptible to ordinary understanding and can be applied by the finder of fact without further explication. See, e.g., *People v Martin*, 271 Mich App 280, 352-353; 721 NW2d 815 (2006) (holding that it is unnecessary specifically to define the words used in a statute for the finder of fact when the terms are susceptible to ordinary comprehension); see also *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 790; 685 NW2d 391 (2004) (recognizing that expert testimony is not required when it merely deals with a proposition that is not beyond the ken of common knowledge). By referring to abuse that amounts to battering or torture or other severe physical abuse, the Legislature expressed its intent to differentiate the abuse that falls within the meaning of MCL 712A.19b(3)(k)(*iii*) from other less serious forms of physical abuse. In ordinary speech, to batter means to "beat with successive blows so as to bruise, shatter, or demolish," "to subject to strong, overwhelming, or repeated attack," "to wear or damage by hard usage or blows," "to strike heavily and repeatedly." *Merriam-Webster's Collegiate Dictionary* (11th ed). Torture, by contrast, encompasses the "infliction of intense pain (as from burning, crushing, or wounding) to punish, coerce, or afford sadistic pleasure." *Id.* Finally, by referring to "other severe physical abuse," MCL 712A.19b(3)(k)(*iii*), the Legislature clarified that battering and torture are forms of severe physical abuse and, as a corollary, physical abuse will not be severe unless it is on par with physical abuse that amounts to battering or torture. See *GC Timmis & Co v Guardian Alarm Co*, 468 Mich 416, 421-422; 662 NW2d 710 (2003) (noting that a statute should be read in context and that terms grouped in a list should be given related meaning). Moreover, the Legislature—in a related statute—clarified that a severe physical injury is one that "requires

-5-

medical treatment or hospitalization and that seriously impairs the child's health or physical well-being." MCL 722.628(3)(c); see also MCL 722.638(1)(a)(*iii*). Consequently, the trial court could properly find whether the DHHS had established this ground for termination by applying its own commonsense understanding of those terms; there was no need for testimony or evidence establishing what constitutes battering, torture, or other severe physical abuse.

The testimony and evidence permitted an inference that father had repeatedly physically abused the boys over a period of years and that the abuse amounted to battering, torture, or other severe physical abuse within the meaning of MCL 712A.19b(3)(k)(*iii*). There was evidence that father escalated his use of corporal punishment over the years to increase the level of pain that he inflicted with each punishment; he first used a pipe, switched to a leash, and ultimately settled on a two-by-four piece of wood. He also admitted to an officer that the spankings occurred daily. There was likewise evidence that father repeatedly and heavily struck the boys with the two-by-four during each incident, such as by winding up his swings like a baseball batter. Finally, the medical testimony established that the injuries required medical treatment, impaired the children's health (for example, their ability to physically move and by exposing the boys to a risk of infection from their untreated wounds), and, in CH's case, likely caused permanent physical change. Thus, there was sufficient evidence to support the trial court's finding that father abused both boys and that his abuse amounted to battering, torture, or other severe physical abuse. MCL 712A.19b(3)(k)(*iii*). And we are not left with the definite and firm conviction that it was mistaken when it made that finding. *In re Gonzales/Martinez*, 310 Mich App at 430.

Because the trial court did not clearly err when it found that the DHHS had established this ground for termination by clear and convincing evidence, we decline to consider whether the DHHS established the remaining grounds for termination. See *In re Gonzales/Martinez*, 310 Mich App at 431 (stating that the DHHS need only prove one statutory ground for termination).

## C. BEST INTERESTS

Father next argues that the trial court's findings on the children's best interests were inadequate and that it clearly erred when it found that termination of his parental rights was in the children's best interests. This Court reviews for clear error a trial court's finding that termination is in a child's best interests. *In re Gonzales/Martinez*, 310 Mich App at 430.

Before addressing the merits of this claim, we note that father also challenges whether the trial court erred when it found that termination of mother's parental rights was in the children's best interests. Although he might be disappointed by the decision, father did not suffer a concrete and particularized injury as a result of the trial court's decision to terminate his wife's parental rights to the children. See *Spires v Bergman*, 276 Mich App 432, 441-442; 741 NW2d 523 (2007). Consequently, he is not an aggrieved party with standing to assert that the trial court erred when it found that termination of his wife's parental rights was in the children's best interests. See MCR 7.203(A).

Father also briefly mentioned that, because the trial court insisted on proceeding with the adjudication trial before father's criminal charges had been resolved, he did not get the opportunity to testify and present his side of the story. Father has, however, not addressed in any meaningful way a claim of error premised on the trial court's decision to proceed with the trial

before the resolution of his criminal charges. Therefore, to the extent that he might find fault with the trial court's decision, he has abandoned that claim of error on appeal. *Mitcham*, 355 Mich at 203.

Turning to the merits, we conclude that the trial court did not clearly err in a way that warrants relief when it found that that termination of father's parental rights was in the children's bests interests.

Once the trial court found that the DHHS had proved at least one statutory ground for terminating father's parental rights, it had to order the termination of his parental rights if it also found by a preponderance of the evidence that termination was in the best interests of the children. MCL 712A.19b(5). The trial court may consider a variety of factors in finding whether termination is in the children's best interests: it may consider the "child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re Gonzales/Martinez*, 310 Mich App at 434 (quotation marks and citation omitted).

In making its best-interest determination, the trial court was plainly concerned by the enormity of the abuse disclosed at trial. It reiterated that the children had been severely mentally and emotionally traumatized by their parents and doubted that the children would ever be able to recover from the psychological injury caused by the abuse. The court also wondered whether the children would ever be able to find the permanency that they deserved. But it was "absolutely convinced that it can't happen under the care and custody of either parent." The children, it explained, desperately needed a healing environment if they were to have "any hope whatsoever," and it was certain that "neither one of these parents is capable of providing that environment." Accordingly, it found that termination was in the children's best interests.

The trial court did not go into detail when discussing its findings on the children's best interests, but it did not have to. "Brief, definite, and pertinent findings and conclusions on the contested matters are sufficient, without overelaboration of detail or particularization of facts." MCR 2.517(A)(2). The trial court plainly found that the children could not be returned to either parent's care without a significant risk that the placement would prevent their recovery or pose a risk to their well-being. On the record before it, the trial court could reasonably find that any further involvement with respondents would not be in the children's best interests. The trial court's statement of its findings met the requirements of MCR 2.517(A)(2).

Father was primarily responsible for the horrific and sustained abuse of both boys. There was also testimony that both boys had serious mental health issues and exhibited problematic behaviors, which required intervention. In fact, by the time of trial, CH had already been transferred to a mental health facility for his care and safety. There was also testimony that both boys did not want anything to do with father. On this record, and except as explained below, it cannot be said that the trial court clearly erred when it found that termination was in the children's best interests. *In re Gonzales/Martinez*, 310 Mich App at 434.

Father also argues that the trial court's finding on best interests—at least with regard to JH—was flawed because it failed to consider that he was still in a relative's care at the time. This Court has held that a "trial court's failure to explicitly address whether termination is

appropriate in light of the children's placement with relatives renders the factual record inadequate to make a best-interest determination and requires reversal." *In re Olive/Metts*, 297 Mich App 35, 43; 823 NW2d 144 (2012).

The Court in *In re Olive/Metts* cited two authorities for the proposition that a trial court must be reversed when it fails to explicitly address whether termination is appropriate in light of the child's placement with a relative: *In re Mason*, 486 Mich 142, 163-165; 782 NW2d 747 (2010), and *In re Mays*, 490 Mich 993, 994 (2012). See *In re Olive/Metts*, 297 Mich App at 43-44. However, our Supreme Court did not explicitly hold in either case that the failure to consider a child's placement with relatives always requires reversal in either of those decisions. And, as Justice MARKMAN observed in his dissent to the decision in *In re Mays*, a trial court's finding may be adequately supported by the record, notwithstanding the trial court's failure to explicitly consider relative placement:

> [T]he proposition that a court must always consider placement with a relative before termination, even after grounds for termination have been established and "best interest" findings made, lacks grounding in the law, which contains no specific factors that a court must invariably consider in deciding a termination case. Rather, what is required is a case-by-case determination . . . . While placement with a relative may in many instances constitute a relevant consideration in the "best interest" determination, the failure to consider it in a particular case does not necessarily preclude the court from determining that termination is in the children's "best interests." The primary beneficiary of the "best interest" determination is the child, and when the child's best interests are clearly served by the termination of rights, the fact that they are then living with a relative does not in every instance undermine that determination. [*In re Mays*, 490 Mich at 996-997 (MARKMAN, J., dissenting) (citations and quotation marks omitted).]

The fact that a child has been placed with a relative appears less relevant in cases where the DHHS has proved that the parent has battered, tortured, or inflicted other severe physical abuse on the child. Cf. MCL 722.638 and MCL 712A.19a(6)(a). Nevertheless, assuming that the trial court erred when it failed to explicitly address the fact that JH was in relative care at the time of the trial, we conclude that the error does not warrant relief under the unique facts of this case.

At trial, the children's uncle testified about their placement and described the children's difficulties adjusting to a normal life. He stated that CH had to be placed in a mental health facility because of his behaviors. He also warned that he could not keep JH for the long term for similar reasons. Consistent with this testimony, the record shows that JH was placed in the same mental health facility as CH after the trial; and it was not anticipated that either child would be ready for relative placement before April 2017. On these facts, it would be a waste of judicial resources to send the case back to the trial court to consider a factor that is no longer applicable and that likely had little relevance given the nature of the abuse at issue. Consequently, we conclude that the error does not warrant relief. MCR 2.613(A); MCR 7.216(A)(7).

The trial court did not err when it terminated father's parental rights.

III. RESPONDENT-MOTHER'S ISSUES ON APPEAL

A. REMOVAL AND AGGRAVATED CIRCUMSTANCES

Mother first argues that the referee at the preliminary hearing did not adequately state its finding that it would be contrary to the welfare of the children to remain in her care. She also maintains that the allegations in the petition were insufficient to support such a finding as to her. More specifically, she states that there was no record evidence that she engaged in abuse that met the aggravated circumstances stated under MCL 722.638—that is, that she either battered, tortured, or subjected the children to other severe physical abuse, or that she failed to protect the children from such abuse. Because she did not raise this issue before the trial court, we shall review her claim for plain error affecting her substantial rights. *In re Utrera*, 281 Mich App at 8-9.

At the preliminary hearing in a termination proceeding, the trial court must consider the petition and find whether there is "probable cause to substantiate that the facts alleged in the petition are true and that if proven at trial would fall under" MCL 712A.2(b). *In re Hatcher*, 443 Mich 426, 435; 505 NW2d 834 (1993). The court's "jurisdiction is established by the contents of the petition after" the trial judge or referee "has found probable cause to believe that the allegations contained within the petitions are true." *Id.* at 437; see also MCL 712A.13a(2).

In this case, the referee ordered the children to be placed with someone other than their parents. For that reason, the referee had to find that it was "contrary to the welfare of the [children] to remain at home and the reasons supporting that finding." MCR 3.965(C)(3). In making the findings, the referee could properly rely on the petition's allegations, if those allegations possessed adequate indicia of reliability. *Id.* The referee found that it was contrary to the children's welfare to remain in either parents' care on the basis of the "substantial risk of harm" to the children; a risk that flowed from the abuse that they "have endured and the injuries that they have sustained." The referee clarified that it was relying on the "uncontested" allegations within the petition, including allegations that the children suffered "other injuries," which were substantiated by "medical personnel." It also found that placement of the children with their parents "presents a substantial risk of harm to the child or children's life, physical health, and mental wellbeing." Because there was no adequate way to safeguard the children from the risks, the referee stated, it was necessary to remove the children from their parents' house. See MCL 712A.13a(5) (requiring removal of the child from his or her home where the petition alleges abuse and the court finds that the conditions of custody are not adequate to safeguard the child from the risk of harm). These findings met the requirements of MCR 3.965(C)(3) and MCR 2.517(A)(2), and established that removal was appropriate.

On appeal, mother argues that the petition did not establish that she inflicted any abuse and that there was similarly no allegations establishing that she knew about the abuse and failed to prevent it. Because there were no allegations establishing that the children's life, physical health, or mental well-being were unreasonably placed at risk, see MCR 3.903(C)(4), she further maintains, the referee erred when it found that it was contrary to the welfare of her children to leave them in her care.

The DHHS alleged that father beat CH with a two-by-four piece of wood and a leash and injured him. The child's grandparents became aware of the injury when mother left him in their care. They reported that the injury was so severe that CH's clothing was stuck to his injured skin. The child's grandmother contacted mother, made her aware of the injury, and asked her to check on JH's wellbeing; she also asked her to call the police department to report the abuse. The grandmother reported to the DHHS that her daughter responded that JH was fine and that CH's injuries were from spankings. After JH was removed from his parents' care, it was discovered that he too had a significant injury. Finally, the DHHS alleged that mother failed to protect the children from harm. The allegations, when read together, justify a determination that there was probable cause to believe that mother knew that both children were being severely physically abused, had the opportunity to intervene, and did nothing to prevent it.

The allegations, if true, established that CH suffered a serious physical injury. When informed about the injury, mother acknowledged that she knew about it and specifically attributed it to spanking. While she maintains on appeal that this acknowledgement did not establish that she knew about the severity of the injury, her own mother felt it was serious enough to contact her, to tell her to check on JH, and to call the police department. Further, a doctor expressed concern about the seriousness of CH's injury when he was examined approximately six weeks later; the doctor also discovered that JH had a serious and recent injury. Taken together, the allegations established probable cause to believe that mother knew that CH had an injury, refused to acknowledge its severity despite its obvious seriousness, and disregarded her own mother's concerns that she should immediately seek to protect JH by calling the police department. The allegations also permit an inference that JH suffered a serious injury as a result of mother's failure to intervene and protect him from the abuse.

The referee's findings complied with the requirements of the court rules and were supported by the allegations in the petition.

Under this same claim of error, mother further maintains that the trial court never found that she failed to take reasonable steps to intervene to eliminate the risk of harm to the children and, in any event, there was no evidence to support such a finding. See MCL 722.638(2). Although she frames this issue as one involving the trial court's finding as to whether she subjected the children to abuse amounting to battering, torture, or other severe physical abuse, or failed to prevent such abuse, the trial court did not have to find that respondent-mother engaged in abuse that met the requirements of MCL 722.638(1) or (2) before it could assume jurisdiction to consider her fitness as a parent or terminate her parental rights. Rather, the trial court could proceed to adjudication and terminate her parental rights at the initial disposition if the original petition requested termination, and if it found by a preponderance that jurisdiction was appropriate, found that the DHHS proved by clear and convincing legally admissible evidence at least one of the statutory grounds stated under MCL 712A.19b(3), and found that termination was in the children's best interests. MCR 3.977(E). As already explained, the DHHS sufficiently alleged that there were aggravating circumstances within the meaning of MCL 722.638(1)(a)(*iii*) and (2). Consequently, the trial court's failure to make a formal determination as to whether there were aggravating circumstances before the adjudication trial did not prevent it from proceeding to adjudication and determining whether mother was a fit parent. In any event, as we shall address below, the evidence presented at trial was sufficient to establish aggravating circumstances.

## B. REUNIFICATION SERVICES

Mother also argues that the referee's finding that the DHHS made reasonable efforts to prevent the children's removal was inadequate because the DHHS made no effort to prevent removal; it merely investigated the grandparents' claims. She further maintains that the DHHS should have prepared and implemented a case service plan for her pending a judicial determination that reasonable efforts were not required because of aggravated circumstances. Because mother did not raise these issues before the trial court, our review is for plain error. *In re Utrera*, 281 Mich App 8-9.

The DHHS must file a petition for authorization under MCL 712A.2(b) if the DHHS determines that a parent abused the child and the abuse amounts to "[b]attering, torture, or other severe physical abuse." MCL 722.638(1)(a)(*iii*). For a petition filed as required under MCL 722.638(1), if the parent is the "suspected perpetrator or is suspected of placing the child at an unreasonable risk of harm due to the parent's failure to take reasonable steps to intervene to eliminate that risk," the DHHS must request the trial court to not only take jurisdiction, but also terminate that parent's parental rights at the initial disposition. MCL 722.638(2).

The DHHS determined that both children had been subjected to abuse that amounted to battering, torture, or other severe physical abuse; it further determined—as stated in the initial petition—that father caused the abuse and mother failed to protect the children from the abuse. As such, it petitioned the trial court to take jurisdiction, hold an adjudication trial, and terminate both mother's and father's parental rights at the initial disposition.

Normally, a trial court must find that custody of the child with the parent presents a substantial risk of harm to the child and that no provision of service or other arrangement except removal is reasonably available to adequately safeguard the child before it could place the child in foster care. MCL 712A.13a(9); MCR 3.965(C)(2). However, because the DHHS alleged abuse within the meaning of MCL 722.638, absent a finding that the conditions of custody were adequate to safeguard the children from the risk of harm, the trial court had to remove the children from mother and father's home once it found that there was probable cause to believe that the allegations were true. MCL 712A.13a(5).

The trial court determined at the preliminary hearing that there was probable cause to believe that the allegations in the petition were true and then made the findings for placing the children outside the home as required under MCL 712A.13a(9) and MCR 3.965(C)(2). It also found that the DHHS's efforts to prevent removal were reasonable, as required by MCR 3.965(C)(4). It then adjourned the preliminary hearing.

When the trial court resumed the preliminary hearing on November 25, 2015, it informed the parties that it was not going to order a service plan because the DHHS was requesting permanent jurisdiction; it explained that it would not order a plan unless it decided not to terminate parental rights at the initial disposition, which would be after the adjudication trial. Although the trial court did not make specific findings supporting its decision not to order services, its stated reason suggests that it determined that services were unnecessary because respondents had subjected the children to the aggravated circumstances addressed under MCL 722.638(1) and (2), which was consistent with the earlier finding that there was probable cause

to believe that the DHHS's allegations were true. When there has been a judicial determination that a parent has subjected a child to the aggravated circumstances stated under MCL 722.638(1) and (2), the trial court has no obligation to make a reasonable efforts finding and does not have to order that reasonable efforts be made to reunify the child and family. See MCR 3.965(C)(4)(a); MCL 712A.19a(2).

On appeal, mother states that the referee's finding that the DHHS made reasonable efforts to prevent removal was flawed because the DHHS did not take any steps to prevent removal; it merely investigated the allegations of child abuse. The referee, however, had to remove the children under MCL 712A.13a(5) on the basis of the allegations alone. In any event, mother does not identify any actions that the DHHS could have taken in the short period between the removal on November 16 and the preliminary examination on November 17, which could have prevented the children's removal, other than conducting an investigation to determine if the claims of abuse were well-founded. And the investigation itself revealed the evidence leading to the allegations that supported probable cause to believe that mother and father had in fact abused the children and that the abuse amounted to battering, torture, or other severe physical abuse within the meaning of MCL 722.638(1) and (2). Under those circumstances, it was not plain error for the referee to find that the investigation was sufficient to satisfy the requirements of MCR 3.965(C)(4). *In re Utrera*, 281 Mich App 8-9.

Mother also maintains that, notwithstanding MCL 712A.19a(2)(a), the DHHS had to make reasonable efforts to reunify her with her children by providing her with services in the interim between the preliminary hearing and the adjudication, which was the point at which the trial court formally found that the children had been subjected to abuse with the aggravating circumstances stated under MCL 722.638(1) and (2). It is not clear that the Legislature's reference to a judicial determination in MCL 712A.19a(2)(a) requires that the determination be made at any particular type of hearing or that it be formalized in any particular way. Indeed, it appears that the trial court determined that there were aggravating circumstances at the preliminary hearing, even though it did not check the appropriate boxes on the order. The better practice would have been for the trial court to hold a hearing on the issue and resolve it by making a formal determination and checking the appropriate boxes on its orders. But the trial court's failure to follow the better practice does not warrant reversal.

This Court has held that the DHHS has no obligation to provide reunification services to a parent when the DHHS's goal is termination. See *In re HRC*, 286 Mich App 444, 463; 781 NW2d 105 (2009). Mother concedes this point, but suggests that *In re HRC* and its progeny were wrongly decided; be that as it may, even if it were wrongly decided, it cannot be said that the trial court plainly erred by following that precedent and proceeding as it did.

Mother also argues that, because the trial court actually ordered the DHHS to make reasonable efforts to reunify her with her children by checking certain boxes on its orders, it was error for the DHHS to fail to do so. She further maintains that, had it provided her with services, she might have demonstrated sufficient improvement in the few months between the preliminary examination and the adjudication trial to alter the outcome of the latter proceeding. The record shows that the trial court entered orders stating that the DHHS should make reasonable efforts to reunify mother with her children and the DHHS made no efforts to provide mother with services.

Given the trial court's determination at the November 25 continued preliminary hearing that no services should be provided, it is possible that the trial court inadvertently checked the box requiring services. If that were the case, it may have corrected the error or held a hearing for a formal judicial determination of aggravated circumstances, had mother brought the error to the court's attention at that time. Hence, it is not clear on this record that the she could have prevailed on this issue had she timely raised it before the trial court.

In addition, although mother points to some evidence from the trial tending to suggest that she was capable of reform, there was also testimony that she had serious mental health issues that required long term therapy before she would be able to care for her children without risk of harm. Accordingly, even if the trial court intended to order the DHHS to provide services, mother has not established that, but for the DHHS's failure to comply with the court orders, the outcome would have been different. Mother has not shown plain outcome determinative error. *In re Utrera*, 281 Mich App 8-9.

## C. STATUTORY GROUNDS AND BEST INTERESTS

Mother next argues that the trial court's findings on the statutory grounds for termination were inadequate and clearly erroneous. She similarly states that the trial court clearly erred when it found that termination was in the children's best interests. Finally, she maintains that the guardian ad litem appointed to represent the children failed to adequately investigate the children's wishes and make those wishes known to the court, which prejudiced her trial.

This Court reviews de novo whether the trial court properly selected, interpreted, and applied the relevant statutes. *IME*, 306 Mich App at 433. This Court reviews for clear error a trial court's factual findings in a termination proceeding. *In re Gonzales/Martinez*, 310 Mich App at 430. As to mother's claim that the children's guardian ad litem failed to meet with the children and failed to apprise the court of their wishes, because mother did not properly preserve that claim by raising it before the trial court, this Court's review is for plain error affecting her substantial rights. *In re Utrera*, 281 Mich App at 8-9.

At the close of proofs, the trial court found that the DHHS had established by clear and convincing evidence grounds to terminate mother's parental rights under MCL 712A.19b(3)(b), (g), (j), and (k). Although the trial court did not specifically state that mother abused CH and JH and that her abuse included "[b]attering, torture, or other severe physical abuse," see MCL 712A.19b(3)(k)(*iii*), read in context, it is evident that the trial court found that mother participated in father's abuse and that the abuse amounted to battering, torture, or other severe physical abuse.

The trial court unequivocally found that the children had suffered physical injury and that the injuries rose "to the level of battering, torture, or other severe physical abuse." The court also found that "the bulk of the injury was caused by the father, inflicted by the father." But recognizing that father inflicted the "bulk" of the injuries is not the same as finding that mother did not inflict any of the injuries; indeed, the court specifically stated that the "evidence" showed that "she herself used a board, among other things, to punish the boys." It also rejected the argument that, because the evidence showed that her discipline was not as severe as father's, it did not rise to the level of battering, torture, or other severe physical abuse: "Maybe she didn't

-13-

hit as hard, but I don't think you'd have to hit very hard to inflict excruciating pain when it's—when it's on top of the wounds that they've already been given." Finally, the trial court stated that "the evidence is clear and convincing that neither of these children can be returned to either parent, or they will be subject to future abuse." The court clearly believed that mother bore some responsibility for inflicting abuse that amounted to battering, torture, or other severe physical abuse and that she too posed a threat to the children.

Both boys testified that mother did not punish them as much as father and did not inflict the injuries. But there was evidence from which the trial court could determine that mother in fact participated in the severe abuse—notwithstanding the boys' statements. See *In re Miller*, 433 Mich 331, 337; 445 NW2d 161 (1989) (stating that it is for the trier of fact to determine the weight and credibility to accord the testimony of the witnesses). CH stated that mother beat him with the two-by-four "now and then," and mother admitted to an officer that she disciplined the boys with the board. JH too testified that mother hit him with the board, but she "went light" on them. Despite the children's efforts to minimize her involvement, on the totality of the evidence, the trial court could infer that mother participated in abuse that amounted to battering, torturing, or other severe physical abuse.

JH testified that mother would hit them with the board at father's insistence, but CH stated that she would do it when father was not around to do it himself or when she felt that father was going to beat him so severely that he might be put out of his "misery." While CH apparently thought that mother was doing him a favor by beating him with the two-by-four on those occasions, the trial court could reasonably infer from this testimony, her admissions, and the testimony about the pervasiveness of the abuse, that mother accepted the disciplinary regime and participated in it, even though it plainly amounted to severe physical abuse. There was also testimony and evidence that JH had a serious physical injury to his buttocks on the evening that he was removed from his home—an injury that required hospitalization and which one doctor thought might require surgical intervention; and yet mother admitted to spanking him *five* times with a board on that very day. As the trial court stated, one would not have to hit very hard "to inflict excruciating pain"—that is, pain that rose to the level of torture—when the blows fall on an existing injury like the one described by the doctor. The evidence that mother inflicted additional injury on a child already suffering from a serious physical injury strongly suggested that she participated in the abuse of the children, even if father was the primary abuser.

When read in context, the trial court impliedly found that mother participated in the abuse of her children along with father—even though he was responsible for the "bulk" of the abuse—and found that the abuse amounted to battering, torture, or other severe physical abuse. And the testimony and evidence supported that finding. Consequently, the trial court did not clearly err when it found that the DHHS had proved by clear and convincing evidence grounds to terminate mother's parental rights under MCL 712A.19b(3)(k)(*iii*).

The trial court also found that mother knew about father's abuse, had the opportunity to prevent it, and did not stop it:

-14-

> Certainly the—the testimony was that the bulk of the injury was caused by the father, inflicted by the father, the battering, the torture was inflicted by the father. But did mom have the opportunity to prevent? Absolutely, she did. She dressed the injuries. She saw them, took no steps to prevent them.

On the basis of these findings and its finding that the children would again be abused if returned to mother's care, the trial court found that the DHHS established grounds for terminating mother's parental rights under MCL 712A.19b(3)(b)(*ii*).

The children testified that mother was not the primary abuser and that she was often away when father inflicted the most serious injuries. However, the children also offered testimony that permitted an inference that she was fully aware of the nature and extent of the abuse. Both boys testified that they were subjected to daily beatings over a span of years and that the beatings would cause their buttocks to swell, blister, and bleed. Their injuries made it difficult to move and both testified that the injuries would stick to and soil their clothing. JH testified that he would sometimes have to use diapers because of the wounds. The pervasiveness of the abuse coupled with the visible signs of the severity of the abuse permitted an inference that anyone living at the home must have been aware of the abuse. But even setting aside that inference, the children testified that mother actually knew about specific instances of abuse that plainly amounted to other severe physical abuse.

CH testified that mother would help him with his injuries by bandaging them. While bandaging his wounds she would explain that what he did was wrong and that he should not do it anymore because she "hated seeing" him get "hurt." Although CH tried to minimize her culpability by stating that she was "wasn't home to know basically all of it," he testified that "she would see how bad it was" when she bandaged him. The last time she bandaged him, she had to have seen how severe it really was because he had "four holes" on his butt and she had to put "on four giant band aids"; the injuries at that time were a "giant blister bloody mess." He also repeatedly told her that he did not want to return home to the abuse, told her that he could not take it anymore, and there was testimony that she was aware that he tried to kill himself as a result of the constant abuse. Moreover, on the occasion when he broke his knuckle and had to go to the hospital, there was testimony that mother knew how he really broke his knuckle and yet did not correct him when he lied to the doctor to protect his family. JH did testify that CH broke his knuckle in an accident, but the trial court was free to disbelieve that portion of his testimony and infer instead that mother not only knew about the abuse that led to the broken knuckle, but allowed CH to lie to the doctor in order to protect herself and father. See *In re Miller*, 433 Mich at 337.

JH similarly testified that mother knew about the beatings; she would have a little talk with him afterward about what he had done wrong to merit the punishment. She would also help him with his injuries; she would bandage them, put Bag Balm on them, occasionally give him a pain pill, and would also help him put on his diapers in a way that would hurt less. When considered as a whole, the testimony and evidence supported the trial court's finding that mother knew what was going on in her home; she knew about the extreme corporal punishment and knew that her children were suffering repeated and significant physical injuries as a result.

On appeal, mother argues that the evidence shows that CH did not reveal the severity of the abuse until around the time she placed him in her parents' care. But that contention is belied by the testimony from both boys that the abuse was pervasive, had been going on for years, and frequently resulted in significant injuries—injuries that mother had to help them bandage and treat. Further, their testimony was corroborated by medical testimony showing that CH injuries were consistent with having been severely beaten over a long period.

There was also evidence that mother had the opportunity to intervene and prevent the abuse, but failed to do so, and that it was reasonably likely that the children would be again exposed to abuse if returned to her care. CH testified that mother frequently argued with father about the beatings and even asked him to stop. Nevertheless, the beatings did not stop. She continued to lecture the boys after the beatings and admonished them to cease doing the things that led to the beatings. When the beatings did stop, they stopped because the boys' grandparents—not mother—reported the abuse; and they did so only after mother refused to go to the police department when informed about CH's injuries. The fact that mother was able to place CH with her parents, which inadvertently protected him from abuse, is evidence that mother was fully capable of intervening to prevent the abuse. There was testimony too that, when confronted with the abuse against the children, mother refused to acknowledge the extent and severity of the abuse. Indeed, despite the severity of the harms inflicted on the children, mother opined that father did nothing criminal and stated that the family just needed counseling. There was even testimony that tended to suggest that mother felt that the routine physical abuse was not a matter of concern—the family's real problem was CH's behavior.

There was expert testimony that tended to establish that mother had mental health issues that made it likely that she would again harm her children, or fail to protect them from harm, if returned to her care. The doctor who assessed mother indicated that she deferred to father's disciplinary regime despite the severe injuries because it was the only way to get through to the children. The doctor opined that mother's therapy needs are long term; she needed to get more interested, more nurturing, and more empathic. Testing showed that she seeks the approval of people she perceives to be stronger than her and that she has difficulty handling disappointment. Mother was disposed to go along with father's wishes, and it was possible that she would repeat this pattern in relationships. On appeal, mother points to testimony that tended to permit an inference that she was amendable to improvement, but it was ultimately for the trial court to assess the weight and credibility of the testimony and it plainly found that she was not capable of safely parenting the children and would not be capable within a reasonable time. *In re Miller*, 433 Mich at 337.

Examining the totality of the evidence, the trial court could reasonably find that mother knew about the injuries and abuse, had the opportunity to prevent the injuries and physical abuse, and failed to do so. It could further find, on the basis of the evidence, that she lacked insight into the mental and physical harms that she caused and would likely subordinate her children's needs to her need for approval from others, and that there was a "reasonable likelihood" that she would again subject the children to abuse or allow them to be subjected to abuse "in the foreseeable future" if placed in her home. MCL 712A.19b(3)(b)(*ii*).

Mother argues that there was no possibility that the children would be harmed if returned to her care because father was incarcerated throughout the proceedings. However, as this Court

has recognized, the Legislature did not require proof that the children would be subject to harm from the same abuser before a court could terminate a parent's parental rights under MCL 712A.19b(3)(b)(*ii*); rather, that statutory ground "addresses the harm occasioned by a parent who is unwilling or unable to protect his or her children from abuse." *In re Gonzales/Martinez*, 310 Mich App at 432. Here, there was evidence that mother acquiesced to father's use of extreme corporal punishment to discipline the boys, refused to protect the children when given the opportunity, and that there was a reasonable likelihood that she would repeat that pattern in her relationships in the future. Consequently, the trial court did not err when it found that the DHHS had proved by clear and convincing evidence grounds to terminate mother's parental rights under MCL 712A.19b(3)(b)(*ii*).

This same evidence supports the trial court's findings that termination was warranted because mother failed "to provide proper care or custody" to her children and "there is no reasonable expectation that [she] will be able to provide proper care and custody within a reasonable time" considering the children's ages. MCL 712A.19b(3)(g). It also supports the trial court's finding that, "based on the conduct or capacity" of mother, there is a "reasonable likelihood" that the children "will be harmed" if returned to mother's home. MCL 712A.19b(3)(j).

The trial court did not clearly err when it found that the DHHS had proved by clear and convincing evidence each of the grounds for termination.

Mother is correct when she states that the trial court did not clearly delineate its findings on the statutory grounds from its findings on the children's best interests. However, it did find that termination of mother's parental rights was in the children's best interests. And when the court's findings are read as a whole, it is similarly clear that the trial court found that it was in the children's best interests because the children would have the best opportunity to recover from their psychological injuries if it terminated both parents' parental rights.[2]

The trial court found that both boys had been subjected to battering, torture, or other severe physical abuse, but it also found that both boys had been subjected to "psychological injury." It worried that the boys might never recover from the psychological injuries that their parents inflicted: "The testimony was so clear. They have been so traumatized I doubt seriously that either one of these boys is ever going to recover from their psychological injuries." It felt that the boys had "little likelihood of leading normal lives." Although mother suggests that the trial court was referring to father's abuse, it is clear that the trial court found that both parents were responsible for the psychological injuries:

---

[2] Mother mentions in passing that the trial court did not consider the fact that the boys were in relative placement, citing *In re Olive/Metts*. However, she abandoned this claim of error by failing to adequately brief it on appeal. *Mitcham*, 355 Mich at 203. Even if she had not abandoned this claim, we would decline to grant her relief for the same reasons stated above; namely, because the children are no longer in the care of relatives.

And what I find even more offensive is they were blamed. These boys didn't—weren't born monsters. You made them monsters. You made them that way by beating them senselessly. And even if there was some grain of hope in your mind, some thought that this might fix them and stop the behavior, when you saw that didn't work, you didn't—you still didn't stop. It got worse. You beat `em harder. And the harder you beat them, the worse they got. You'd think a light bulb would have went on at some point that this isn't working.

The evidence at trial clearly showed that mother not only acquiesced to an extreme disciplinary system, she also counseled the children that they were being beat because they had done wrong; that is, there was evidence that mother told the boys that they deserved the severe physical abuse, which is precisely the type of blaming that the court found so offensive. In discussing the children's needs as a result of the psychological abuse, the trial court firmly stated that neither parent could provide the children with the permanency that they so desperately needed: "I am absolutely convinced that it can't happen under the care and custody of either parent." The court further explained that it was in the children's best interests to terminate both parents' parental rights because the children needed a "healing environment, and neither one of these parents is capable of providing that environment."

When read as a whole, the trial court's findings on the children's best interests met the requirements of MCR 2.517(A)(2). The trial court properly focused its findings on the needs of the children and whether termination would be in their best interests under the totality of the circumstances, and its finding was not clearly erroneous. See *In re Gonzales/Martinez*, 310 Mich App at 434-435.

Mother further failed to establish that her children's guardian ad litem failed to properly represent her children in a way that prejudiced her trial. A lawyer guardian ad litem represents the child in a termination proceeding, MCL 722.24(2), and his or her duty is to the child alone, MCL 712A.17d(1). Although a guardian ad litem has an obligation to assess the child's "needs and wishes with regard to the representation and the issue in the case," MCL 712A.17d(1)(d), the guardian ad litem cannot be compelled to testify regarding matters related to the case and his or her file is not discoverable, MCL 712A.17d(3). As such, the guardian ad litem had no obligation to take any steps on mother's behalf, and mother had no right to any information that he might have possessed about the children's needs or wishes in the litigation. Consequently, she cannot establish plain error affecting her substantial rights arising from his purported failure to adequately discover the children's wishes. *In re Utrera*, 281 Mich App at 8-9.

## D. INEFFECTIVE ASSISTANCE

Mother finally argues that her trial lawyer did not provide effective assistance. Specifically, she argues that her trial lawyer should have argued before the trial court that the DHHS had an obligation to provide her with reunification services. Because the trial court did not hold an evidentiary hearing on this claim of error, there are no findings to which this Court must defer; instead, this Court's review is limited to mistakes that appear on the record alone. *People v Gioglio (On Remand)*, 296 Mich App 12, 20; 815 NW2d 589 (2012), remanded for resentencing 493 Mich 864 (2012). This Court reviews de novo whether a particular act or

omission fell below an objective standard of reasonableness under prevailing professional norms and prejudiced a respondent's trial. *Id.* at 19-20.

A parent involved in a termination proceeding has the right to appointed counsel and that right includes the right to have competent representation. *In re Simon*, 171 Mich App 443, 447; 431 NW2d 71 (1988). When a parent argues that he or she did not receive competent representation, "this Court applies by analogy the principles of ineffective assistance of counsel as they have developed in the criminal law context." *Id.* Accordingly, mother must show that her trial lawyer's failure to assert her right to have reunification services fell below an objective standard of reasonableness under prevailing professional norms and that there is a reasonable probability that, but for the error, the outcome would have been different. *Gioglio*, 296 Mich App at 22.

In asserting her claim of ineffective assistance, mother must also overcome the strong presumption that her trial lawyer acted within the wide range of reasonable professional assistance. *Id.* "Reviewing courts are not only required to give counsel the benefit of the doubt with this presumption, they are required to affirmatively entertain the range of possible reasons that counsel may have had for proceeding as he or she did." *Id.* (quotation marks and citation omitted). If this Court determines that there might have been a legitimate strategic reason for the act or omission after affirmatively entertaining the range of possible reasons for the act or omission, then this Court must conclude that the act or omission fell within the range of reasonable professional conduct. *Id.* at 22-23.

As already discussed, the DHHS adequately alleged that mother's treatment amounted to aggravating circumstances under MCL 722.638(2). In addition, when considering the evidence presented at the adjudication trial, it is evident that the DHHS could have presented evidence to support a judicial determination that the aggravating circumstances applied to mother at a hearing on that issue, had the trial court held one at any point prior to the adjudication trial; and the DHHS would have had no obligation to provide reunification services after such a determination. MCL 712A.19a(2)(a). Under these circumstances, a reasonable trial lawyer might conclude that it would be a waste of resources to challenge the trial court's failure to make a formal determination prior to the adjudication trial.

The allegations and evidence in this case also show that she would likely have lost such a challenge and, by requesting a formal hearing, mother's trial lawyer might have emphasized or brought forth evidence that would be harmful to mother at the adjudication trial. Further, her trial lawyer might have reasonably concluded that the DHHS's provision of services in the few months before the adjudication trial would not benefit mother's case at trial and might give rise to evidence tending to support termination. Stated another way, mother's trial lawyer might have made a strategic decision to refrain from challenging whether mother was entitled to reunification services until after the adjudication trial. On this record, mother has not overcome the presumption that her trial lawyer's performance fell within the wide range of reasonable professional conduct. *Gioglio*, 296 Mich App at 22-23.

## IV. CONCLUSION

The trial court did not clearly err when it found that the DHHS established by clear and convincing evidence at least one statutory ground for terminating the parental rights of each respondent. There was also ample evidence to support the trial court's finding that termination was in the children's best interests, and the trial court's failure to specifically consider JH's placement with a relative did not amount to error warranting relief. Because there were no errors warranting relief, we affirm in both dockets.

Affirmed.

/s/ Michael J. Kelly
/s/ Peter D. O'Connell
/s/ Jane M. Beckering